IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | |
|---|---|
| ROSINA C. BROWN, ) | Civil Action No. 3:09-813-CMC-JRM |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| ANTHONY KESTER; ) | **REPORT AND RECOMMENDATION** |
| SUSAN LIFSEY THERIOT; AND ) | |
| CORNELIA GIBBONS, IN THEIR OFFICIAL ) | |
| AND INDIVIDUAL CAPACITIES, ) | |
| ) | |
| Defendants. ) | |
| ) | |

Plaintiff, Rosina C. Brown ("Brown"), filed this action on March 30, 2009. She filed an amended complaint ("AC") on July 2, 2009. Brown alleges claims under 42 U.S.C. § 1983 and the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq.[1] Defendants are Anthony Kester ("Kester"), the former Finance Director and current Acting Director of the Lieutenant Governor's Office on Aging ("LGOA"); Susan Lifsey Theriot ("Theriot), the former Human Resource Director and current Program Manager of the LGOA; and Cornelia Gibbons ("Gibbons"), the former Director of the LGOA.[2] On June 30, 2010, Defendants filed a motion for summary judgment. Plaintiff filed a response on August 27, 2010, and Defendants filed a reply on September 7, 2010.

---

[1]Pretrial matters in this case were referred to the undersigned pursuant to Rule 73.02(B)(2)(g), DSC. Because this is a dispositive motion, this report and recommendation is entered for review by the court.

[2]On March 11, 2010, the Honorable Cameron M. Currie, United States District Judge, dismissed Brown's FMLA claim for monetary damages against all Defendants and dismissed Brown's FMLA claim for injunctive relief against the LGOA and Defendant Gibbons.

**FACTS**

1. Brown, who has a Masters degree in Public Health, began employment with the South Carolina Department of Health and Human Services ("DHHS") as a Program Coordinator in December 1996. She had been hired as a temporary employee in October 1996. See Plaintiff's Deposition ("P. Dep.") 9-10, 15-17.

2. Brown was diagnosed with Systemic Lupus in 1986. The disease restricts her activities and causes a loss of mobility, a weakened immune system, and increased susceptibility to illness and disease. As a result, she had to take leave on a periodic basis. AC, Paras. 8-9, 11.

3. In December 2001, Brown transferred to the Office on Aging under the DHHS as a Program Coordinator. In that position, Brown monitored the budgeting of ten Area Offices on Aging throughout the State, kept spreadsheets for the Area Offices, and worked with her supervisor Bruce Bondo ("Bondo") on planning, allocations, and budgeting for the Area Offices. P. Dep. 17-19, 55-58.

4. In approximately June/July 2004, the Office on Aging was transferred to the Lieutenant Governor's Office, and made a separate agency. At that time, Gibbons was appointed to head the Office. The Office on Aging remained physically housed at DHHS until January 1, 2005, when it relocated to the Wilbur Smith Building on Gervais Street. P. Dep. 49-52 and Defendant's Exhibit ("D. Ex.")[3] 7.

5. Brown's physician, Dr. Troy Gamble, signed a medical certification for Brown dated May 9, 2005, certifying that Brown suffered from Systemic Lupus and that it was necessary for her to be off work on an intermittent basis because of flare ups from her disease. P. Ex. 7.

---

[3]The exhibits referred to are exhibits to Plaintiff's Deposition.

2

6. In June of 2005, the agency began an extensive restructuring process with the aim of improving program management. Brown was notified that she and other employees would be helping out with the South Carolina Access Program ("Access"). P. Dep. 58-59, 62, 73.

7. Later in June, Brown was informed that she was being permanently reassigned to work with Access and that Karen Power-Davis ("Power-Davis"), who had long worked with Access, would be her supervisor. The reassignment did not affect Brown's pay or status. P. Dep. 61, 64-66, 68, 73.

8. Brown described Access as a database that is intended to allow seniors and their family members to "locate...all types of services and resources all over the state," such as sitters, skilled care providers, assisted living facilities/nursing homes, and durable medical equipment providers. P. Dep. 59-60.

9. Office on Aging employees assigned to Access were responsible for compiling a comprehensive data base, keeping it up to date, and "get[ting] the kinks out of [the database] if there were problems. P. Dep. 60-62.

10. Access was a priority project for the Office on Aging, as funding was dependent on it being viable and up to date. P. Dep. 63-64; 75-76.

11. Brown's duties with Access included traveling around the state to make presentations about the website to groups of seniors. She also attended health fairs and expos where she manned a booth that people could visit to learn about the Access program. P. Dep. 67 and D. Ex. 10.

12. Brown was not happy about her permanent reassignment to Access. She says that no one explained why she was reassigned. Brown complained to Bondo, her former supervisor, that

the job was inferior to her qualifications. Bondo told Brown that he could not do anything about the reassignment. P. Dep. 73-74, 76.

13. Following Brown's permanent reassignment to Access, she was required to e-mail Power-Davis when she arrived and left work for the day and whenever she was away from her desk, including breaks and lunch. In her previous assignment, Brown had only been required to e-mail Bondo when she arrived and departed for the day and when she left the building. She had not been required to e-mail Bondo when she went on a break within the building. Power-Davis did not allow her employees to leave the building during their breaks. See P. Dep. 81-89.

14. Power-Davis was more of a "hand-on" manager than Brown previously had at the Office on Aging. In July of 2005, Power-Davis explained to Brown that she thought that a major part of her (Power-Davis') role was to know where her staff was and what they were doing. See P. Dep. 100-101, 103-105.

15. Brown believes that she was singled out by Power-Davis for monitoring more so than were the other two Access Coordinators. She believes that the scrutiny and close attention was due to her chronic illness and use of sick leave. See P. Dep. 105-111, 115-116.

16. On June 21, 2005, Theriot wrote a letter to Dr. Gamble asking that he advise the LGOA of any limitations that would prevent Plaintiff from completing her specified job functions (a copy of her position description was attached) and asking for any accommodations that the LGOA could implement to assist Plaintiff in the performance of her duties. P. Ex. 8.

17. After her move to Access (Brown has not specified the date), Brown conveyed to Power-Davis that the system was cumbersome for senior citizens to navigate. Power-Davis

4

|     |     |
| --- | --- |
|     | agreed with Brown and went to the company that created the system to try to make it easier to use.  Brown says that Power-Davis also told Barbara Link ("Link"), who was Power-Davis' supervisor (see P. Dep. 62), and Barbara Kelley ("Kelley"), who was the Director of Access (and who became Brown's supervisor in March 2007  - see P. Dep. 63, 133), about the problem with Access.   Brown also talked to Kester about the navigation problem.  P. Dep. 132-133. |
| 18. | Brown contends that working in the Access position after June 2005 caused her health to deteriorate from the constant computer work, constant data entries, and constant sitting in one place for seven hours at a time.  She advised her supervisors that working in the Access position was harmful to her physically because of the constant data entry and sitting for hours without moving.  P. Dep. 149, 173. |
| 19. | Brown states that she did not begin to take FMLA leave before June 2005, but used her sick leave prior to that time.  P. Dep. 143. |
| 20. | On July 7, 2005, Brown received an oral/written warning for violations of rules as to when she came and left work.  Brown disagreed with the warning.  P. Dep. 99-103, P. Ex. 13. |
| 21. | Brown received a written reprimand on August 19, 2005 for leaving her workstation without authorization on August 17.  She disagreed with the reprimand and thought she was being watched and targeted.  P. Dep. 107, P. Ex. 14. |
| 22. | Also on August 19, 2005, Kester wrote a letter (at Brown's request) clarifying that Brown was required to present a doctor's statement for any sick leave request.  Brown contends that no other employee had to do so.  P. Dep. 114-118, and D. Ex. 22. |

23. On September 2, 2005, Brown received a counseling session on her job performance. Her taking of breaks and time management were discussed. Theriot and Kester told Brown to stay in her office, not to have visitors, and not to go into other offices. She claims that other Access employees were allowed to speak to other people and were not watched as closely. P. Dep. 136, 138-139, 172; P. Ex. 15

24. In January 2006, this requirement that Brown provide a doctor's statement for any sick leave was modified such that she was required only to provide a doctor's statement for sick leave absences of more than one day. P. Dep. 123-124 and D. Ex. 25.

25. In her June 2006 performance evaluation, Brown was given a rating of "meets."[4] Her supervisors thanked her for "being a great part of the SC Access Team." P. Ex. 2.

26. In November of 2006, after a representative of the State Office of Human Resources confirmed to Brown that the Office on Aging could require a doctor's statement to support sick leave absences of less than three days duration, Brown and Theriot agreed to revisit the requirement that Brown produce doctor's statements for sick leave absences of less than three days. P. Dep. 127-129 and D. Ex. 26.

27. Brown's health condition deteriorated and on November 9, 2006, she applied to the State Retirement Systems to be retired due to disability. Her application was initially denied. See P. Dep. 22-23, 26-33, D. Exs. 2-4.

28. In December 2006, Brown suffered fractures in both of her feet because of Lupus and took FMLA leave until January 2007. P. Dep. 141.

---

[4] The ratings used were "substantially exceeds," "exceeds," "meets," and "below." Brown's 2005 rating was "meets." P. Ex. 2.

29. Approximately four months before she left the LGOA (in April 2007), Brown started working on the Personal Care Registry ("Registry"), adding the names of personal care workers to the Registry. Brown advised Power-Davis that the procedure for adding workers to the Registry was unsafe for the elderly/disabled and their families because non-qualified persons were added to the Registry solely on the basis that the worker had given care to a relative in the past. She also stated that no background checks were performed by the Office on Aging and no disclaimers concerning the personal care workers were listed. Brown states that Power-Davis agreed with Brown and Brown thinks that Power-Davis talked about this with Link and Kelley. P. Dep. 137-138, 145-147, 167-168.

30. Brown was off work from April 16 to April 18, 2007 due to the prior foot fractures. On April 18, Kester and Theriot phoned Brown and told her that if she did not come to work the next day that the process to have her fired could begin. Brown states that although she had called her immediate supervisor about her absences, Kester and Theriot may or may not have known that she called in to say she was sick. Brown also had informed her supervisor that she had a disability hearing scheduled for April 19, 2007. She admits that she never told Kester or Theriot about the hearing. P. Dep. 21, 79-80.

31. On April 19, 2007, Brown went into work prior to her disability hearing. She presented a doctor's note for her three day absence. The note said that Brown should be in a wheelchair as much as possible. She was using a walker and not a wheelchair when she came into the office. Theriot asked Brown to provide an additional doctor's statement that Brown could use a walker, which Brown obtained before attending her disability hearing. P. Dep. 185, P. Exs. 17, 18.

7

32.   On April 19, 2007, after further medical review, the State Retirement Systems approved Brown's retirement due to disability. It was effective the same day. P. Dep. 32-33, D. Ex. 5.

33.   Brown has continued to receive disability benefits from the State of South Carolina and the Social Security Administration since 2007, and remains unable to resume the duties of the Access Coordinator position (the one she last held with the Office on Aging). P. Dep. 34-37.

## **STANDARD FOR SUMMARY JUDGMENT**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). A fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. Anderson, 477 U.S. 242 at 248. "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

The defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson, 477 U.S. at 247-48).

"[O]nce the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine

issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (1) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (2) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c) (1)(A-B).

Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Servs. Co., 80 F.3d 954 (4th Cir. 1996). If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials-including the facts considered undisputed-show that the movant is entitled to it; or (4) issue any other appropriate order. Fed. R. Civ. P. 56(e)(1-4).

## DISCUSSION

Brown has asserted claims under § 1983 against Defendants Kester, Theriot, and Gibbons in their individual capacities for alleged violations of her freedom of speech and freedom of association. Her remaining claim under the FMLA is against Defendants Kester and Theriot in their official capacities for injunctive relief only. Defendants contend that their motion for summary judgment should be granted because: (1) Brown fails to establish her claims under § 1983; (2) Defendants are entitled to qualified immunity as to Brown's § 1983 claims; and (3) Brown's FMLA claim is

9

foreclosed by her continuing inability to perform the duties of the Access Coordinator position that she held.

I.     § 1983 Claims

Defendants contend that Brown fails to establish that her freedom of speech or freedom of association rights were violated. They argue that they are entitled to qualified immunity.

A.     Freedom of Speech

To establish a claim for retaliation in violation of the First Amendment's free speech protections, a public employee plaintiff must show that: (1) she spoke as a citizen, not an employee, on a matter of public concern; (2) her interest in the expression at issue outweighed the employer's interest in providing effective and efficient services to the public; and (3) there was a sufficient causal nexus between the protected speech and the retaliatory employment action. Smith v. Frye, 488 F.3d 263, 267 (4th Cir. 2007). The parties dispute whether Brown's speech was protected under the First Amendment and whether Brown has shown causation.

1.     Protected Speech

Brown argues that her speech was protected by the First Amendment because she spoke as a citizen and her expressions were not made pursuant to her official job duties. She argues that examination of her actual job duties reveals that the work she actually performed was data input, and her supervisors did not allow her to communicate with other Program Coordinators concerning the Access Program or the Registry.

A public employee engages in speech protected under the First Amendment if he speaks "as a citizen on a matter of public concern." Garcetti v. Ceballos, 547 U.S. 410, 418 (2006). This determination is a question of law for the Court to make by examining the content, form, and context

of a given statement, "as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 148 and 148 n. 7 (1983).

Brown argues that the speech in question was not part of her official duties because her only job duty was data input. Her position description, however, provided that she was to:

> [w]ork as part of a team on the SC Access Project to gather, compile, categorize, and enter into a comprehensive automated database, information on resources and services available to the elderly and disabled populations of South Carolina. Review and evaluate policies and standards for capturing and maintaining data and make[] recommendations for enhancing these processes.

D. Ex. 10. The position description included the following specific job duties:

> 3.   [P]articipates in system development and implementation of the statewide I&R system (SC Access) to include identifying needed data elements, search strategies and other functional requirements. Provides direction and guidance to the Office on Aging staff, regional Information, Referral and Assistance Specialists, and staff of other agencies regarding utilization of the system and status of system development. Analyzes assigned portions of the database and makes recommendations for system and/or procedural enhancement to ensure quality and consistency of information entered into the system.
> 4.   Plans and provides general systems training, technical assistance, and program support to a variety of audiences including staff, agencies, organizations, providers and system users on an ongoing basis. Accepts feedback from all sources and users of the SCAccessHelp website and analyzes problems and needs presented in that feedback, reports it to the appropriate staff, and offers solutions and modifications for fixes and enhancements.

P. Dep. D. Ex. 10.

Although a job description alone may not be dispositive of the issue as a job description may differ from the actual job, see Garcetti, 547 U.S. at 424-425, Brown's testimony concerning her job also supports a finding that her speech was not protected. Brown testified that users of Access complained to her that the website was not user friendly, was "cumbersome" to navigate, and contained information that was not always up to date. Brown agreed and passed these complaints,

11

as well as her own similar concerns, to her supervisors (Power-Davis and Link). P. Dep. 92-96. "[W]hen a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job." Davis v. McKinney, 518 F.3d 304, 313 (5th Cir. 2008); see also Rohrbough v. University of Colorado Hospital Auth., 596 F.3d 741, 748-50 (10th Cir. 2010); Fox v. Traverse City Area Pub. Schs. Bd. of Educ., 605 F.3d 345, 349-50 (6th Cir. 2010); Boards v. Solomon, 2010 WL 2178739, *5 (D.S.C. 2010).

Brown's free speech claim is also based on concerns she expressed about the procedure for adding personal care workers to the Registry. She testified that she was assigned to work on the Registry during the last four months of her employment with the LGOA and became concerned that people were being added to the Registry who were not certified or qualified. P. Dep. 137-138, 144-145. Brown only expressed her concern to her supervisor, Power-Davis, who agreed with her. P. Dep. 145-146. She stated that she did not have any conversations about the Registry with any of the Defendants and thought that Power-Davis passed her concerns along to Link and Kelley (up the supervisory chain). P. Dep. 146-147, 167-168. Brown acknowledged that working on the Registry, including identifying issues related to the Registry, "was part of my job." Plaintiff's Dep. 147.

Brown argues that the Fourth Circuit's holding in Andrew v. Clark, 561 F.3d 261 (4th Cir. 2009) supports her claim. That case is distinguishable as it involved a Rule 12(b)(6) motion to dismiss instead of a motion for summary judgment. Additionally, the record here includes Brown's testimony and a copy of her job description indicating that the speech was pursuant to her official duties.

### 2.     Causation

Brown argues that she has shown evidence of causation sufficient to withstand summary judgment because the alleged retaliatory acts (forced isolation, requiring her to stay at her desk and e-mail every time she left, not allowing her to go to Program Coordinator meetings, and needing a doctor's excuse for every use of sick time) occurred after she began to advise her supervisors of concerns with the Access program and the Registry. Defendants contend that Brown cannot establish causation because she cannot show that "but for" her speech the alleged retaliation would not have been taken.

"The causation requirement is 'rigorous' in that the protected expression must have been the 'but for' cause of the adverse employment action alleged. Ridpath v. Board of Governors Marshall Univ., 447 F.3d 292 (4th Cir. 2006), citing Huang v. Board of Governors of the Univ. of N. Carolina, 902 F.2d 1134, 1140 (4th Cir. 1990).

Brown fails to establish causation. She has provided no dates on which she complained about the Access Program in order to show that her speech preceded the alleged retaliation. See Plaintiff's Answers to Defendants' First Set of Interrogatories, Nos. 5 and 10 (Attachment to Defendants' Reply). She concedes that she never made either Gibbons (who retired in June 2006) or Theriot aware of her complaints, reports, or concerns. P. Dep. 131-134; 167-168. As these Defendants did not have knowledge of Brown's allegedly protected speech, they could not have retaliated against her because of that speech. See Causey v. Balog, 162 F.3d 795, 803-804 (4th Cir. 1998), citing Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998). Brown mentioned her concerns about the cumbersome nature of the Access website to Kester on one

13

occasion during a coaching session, but testified that he did not have anything to say about it, that he did not have a reaction one way or another, and he was not hostile to what she was saying.

Two other Access Coordinators reported problems and complaints about the Access website to Power-Davis, but were not subjected to the alleged adverse treatment and working conditions. P. Dep. 88-89, 92-95, 109-110, 137, 160. This suggests that Brown's passing along of consumer complaints, as well as her own, about the website to her supervisors was not the cause of the alleged retaliation. See Burns v. Jackson County Bd. of Comm'rs, 330 F.3d 1275, 1287 (8th Cir. 2003)(evidence that another employee complained about county policies as the plaintiff did and was not terminated undercut the plaintiff's claim that he was terminated because he complained about county policies).

Brown also fails to show that "but for" her allegedly protected speech Defendants would not have retaliated against her. She testified that the real reason she was targeted for adverse action was because of her chronic illness coupled with a systemic effort by management to purge the LGOA of employees who transferred from DHHS in 2004 and to replace them with their own favored employees. P. Dep. 160-165. See Lightner v. City of Wilmington, NC, 545 F.3d 260, 264 (4th Cir. 2008).

    B.  Freedom of Association

Brown alleges that she had a right to associate with her fellow co-workers which was violated because Defendants would not allow her to leave her office without permission, did not allow her to attend Access meetings, and did not allow her to talk with co-workers about work issues during work hours. Brown argues that her right of associating with fellow co-workers was protected because it was an intimate association. She argues that her relationship with fellow staff members

was an expressive association because she needed to associate to obtain and exchange information essential to the performance of her job duties and because the association would have allowed her to express her concerns about the Access Program and the Registry.

The First Amendment protects associational activity of two distinct types: (1) intimate association, that is association with a close and select few persons for purposes such as marriage, procreation, and child-rearing; and (2) expressive association, that is association for the purpose of engaging in activities expressly protected by the First Amendment including speech, assembly, petition for redress of grievances, and exercise of religion. This right, however, does not confer a free-standing right to associate with others for purely social purposes. City of Dallas v. Stranglin, 490 U.S. 24-25 (1989).

Brown has not shown that the right of intimate association is implicated based on an alleged prohibition of associating with co-workers during work hours for work-related reasons. She acknowledged that no one at the LGOA ever tried to restrict her associational rights during non-work time. P. Dep. 151.

Brown also fails to show that the right of expressive association is implicated as she has not shown that the First Amendment recognizes a protected right to associate with other employees for work-related purposes during work time. Other courts that have considered the issue have refused to find such a right. See, e.g., D'Angelo v. School Board of Polk County, Fl., 497 F.3d 1203, 1212-1213 (11th Cir. 2007)(applying the holding in Garcetti to an association claim in finding that principal's associations in connection with meetings he held or attended about converting school to charter status were not protected by First Amendment); Lloyd v. City of St. Charles, Mo., 617 F.Supp.2d 830 (E.D.Mo. 2008)(detective's asserted right to be involved in a certain investigation was

not protected by right of association because he admitted that the investigation was pursuant to his duties as a police officer and thus he could not state a claim that he was acting as a private citizen); Cindrich v. Fisher, 512 F.Supp.2d 396, 404 (W.D.Pa. 2007)(assertion by the plaintiff that she had a First Amendment right to associate with persons who were in positions to protect the public interest failed because she could not show that she was acting as a private citizen).

Additionally, the association rights of public employees, like their free speech rights, are similarly constrained by their public employment. See, e.g., Kirby v. City of Elizabeth City, N.C., 388 F.3d 440 (4th Cir. 2004)(fact that police officer's testimony at fellow officer's disciplinary hearing was not constitutionally protected also foreclosed his related freedom of association claim). Here, Brown's freedom of association claim is related to her freedom of speech claim.

Brown points to cases (see, e.g., Edwards v. City of Goldsboro, 178 F.3d 231 (4th Cir. 1999) and Cromer v. Brown, 88 F.3d 1315 (4th Cir. 1996)) in which a right to associate outside of work was upheld. As noted above, however, Brown acknowledged that none of the Defendants tried to restrict her associational activities during non-work time.

### C.     Qualified Immunity

Defendants contend that they are entitled to qualified immunity on Brown's First Amendment claims because they could have reasonably believed that Brown was speaking in her official role and because there is not a clearly established right to associate with co-workers during work hours regarding work-related matters. Brown argues that the right to freedom of speech and freedom of association was clearly established. She also argues that there are factual issues intermingled with the legal question of legal immunity such that summary judgment is not appropriate.

16

Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The analysis of the defense of qualified immunity is generally examined using a two-step analysis. See Saucier v. Katz, 533 U.S. 194, 201 (2001).[5] The first step is to determine whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the defendants' conduct violated a constitutional right. Id. at 201. If the facts, so viewed, do not establish a violation of a constitutional right, the plaintiff cannot prevail, and "there is no necessity for further inquiries concerning qualified immunity." Id. If, however, a favorable view of the facts does establish such a violation, the next step is to determine whether the right violated was clearly established at the time of the alleged offense. Id. If the right was not clearly established, the defendants are entitled to qualified immunity. Id.

Defendants are entitled to qualified immunity. As discussed above, Brown fails to establish a violation of a constitutional right. Also, Brown fails to show that the right of freedom of speech was clearly established. See DiMeglio v. Haines, 45 F.3d 790, 804-806 (4th Cir. 1995)(not clearly established that public employee's speech was protected when she spoke in his public role and concerning a matter within the scope of his public duties); see also Stickley v. Sutherly, 667 F.Supp.2d 664, 671 (W.D.Va. 2009)(finding that qualified immunity shields a public official for not

---

[5]The Supreme Court has clarified that these steps do not need to be taken in the sequence set forth in Saucier, and that
> [t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs should be addressed first in light of the circumstances in the particular case at hand.

Pearson v. Callahan, 555 U.S. 223 (2009).

17

properly discerning that his decision is on the wrong side of the "ill-defined line" between protected and unprotected speech). She also fails to show that a right to associate with co-workers during work hours was clearly established.

II.     FMLA

Brown's remaining FMLA claim is one for injunctive relief (for reinstatement) against Kester and Theriot. Defendants contend that Plaintiff's claim for prospective injunctive relief is foreclosed by her continuing inability to perform the duties of the Access Coordinator position that she previously held. In her opposition memorandum, Brown argues that she should be restored to the position she held prior to her transfer to the Access position because Defendants assert that the Access position it an equivalent position to her Program Coordinator position. She asserts that she can perform all of the essential functions of the Program Coordinator position that she held from 2001 to 2005, and it is an equivalent position to the Access position.

Under the FMLA, eligible employees may take leave "for medical reasons, the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." 29 U.S.C. § 2601(b)(2). The FMLA provides that eligible employees are entitled to up to 12 workweeks of unpaid leave during any 12-month period. 29 U.S.C. § 2612(a)(1). Leave is permitted when an eligible employee has a "serious health condition" that makes the employee "unable to perform the functions of the position." 29 U.S.C. § 2612(a)(1)(D). The Act prohibits employers from interfering with or denying an employee the rights granted by the FMLA and grants employees a private right of action against employers who violate the Act. 29 U.S.C. § 2615(a)(1); 29 U.S.C. § 2617. Employees who take leave pursuant to the FMLA are generally entitled to return to the same

18

or equivalent position with the same benefits as they had prior to taking the leave. 29 U.S.C. § 2614(a)(1).

Brown's FMLA claim is foreclosed because she admits that she cannot perform the essential functions of the Access job which she held prior to her disability retirement in April 2007. "[T]he FMLA does not mandate that employers reinstate employees who are unable to perform the essential functions of their positions." Battle v. United Parcel Serv., Inc., 438 F.3d 856, 864 (8th Cir. 2006).

Brown argues that she instead should be reinstated to her position she held prior to being transferred to the Access position in June 2005. That position, however, no longer exists. When Brown was permanently reassigned to the Access program in June 2005, her old position was eliminated and her former duties were absorbed by other employees, including Bondo. P. Dep. 76; p. Exs. 3 and 4 (organizational charts). The FMLA does not require that an employer restore an employee, who cannot perform an essential function of the position from which she took FMLA leave, to another position whose functions she can perform or create a job that she can perform. See 29 C.F.R. § 825.216(c)("If the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition...the employee has no right to restoration to another position under the FMLA.").

Additionally, Brown has alleged, testified, and argued that the Access Coordinator position and the Program Coordinator position are not equivalent. See AC, Para. 11; P. Dep. 73-74, 173-174; P. Mem. in Opp. to Summary Judgment at 5. As such, reinstatement to the Program Coordinator position would not be to an equivalent position.[6]

---

[6]Further, if Brown is conceding that this is an equivalent position, she cannot establish an FMLA retaliation claim for the June 2005 transfer as she has not shown that she was subjected to an adverse action as to the transfer.

19

## **CONCLUSION**

Based on the foregoing, it is recommended that Defendants' motion for summary judgment (Doc. 40) be **granted**.

Joseph R. McCrorey
United States Magistrate Judge

January 26, 2011
Columbia, South Carolina